## BROWNE v. SABINE MACHINE & SUP-PLY CO. et al.

### No. 15390.

Court of Civil Appeals of Texas.
Fort Worth.

Dec. 5, 1952.

Morris, Underwood & Oldham, of Houston, for appellant.

Lasseter, Spruiell, Lowry, Potter & Lasater, of Tyler, for appellee, Sabine Machine & Supply Co.

Weeks & Hankerson, of Tyler, for appellees, Halliburton Oil Well Cementing Co. and Schlumberger Well Surveying Corp.

RENFRO, Justice.

The appellees, Sabine Machine & Supply Company, Halliburton Oil Well Cementing Company and Schlumberger Well Surveying Corporation, brought suit against Calvert Corporation and Homer Browne, appellant, for materials, supplies and labor furnished defendants for use in equipping and completion of oil wells upon three described tracts of land, alleging

714

that on the dates the indebtednesses were incurred the defendants were mining partners. Defendant Calvert Corporation filed no answer. Defendant Browne, under oath, denied partnership with Calvert and pleaded that Calvert Corporation was the agent of plaintiff Sabine Machine & Supply Company.

Trial was to the court without a jury and judgment was rendered for appellees against Browne and Calvert Corporation, jointly and severally.

Appellant Browne contends there was no evidence and the evidence was insufficient to support a finding of mining partnership.

It is the claim of appellees that completion of the wells, that is, Schlumberger survey, casing, cement and cementing, tanks, tubing, testing, etc., was a mining partnership undertaking. The court limited recovery to materials, services and supplies furnished after the completion of the footage drilling contract.

█ The burden was on appellees to prove that Calvert Corporation and Browne were mining partners. Bolding v. Camp, Tex.Com.App., 6 S.W.2d 94; 58 C.J.S., Mines and Minerals, § 245, p. 686.

█ Since the case was tried before the court without a jury, we must view the evidence and the inferences drawn therefrom in the light most favorable to the trial court's judgment.

Appellant Browne owned the Shafer lease. Calvert Corporation owned the Long and Bush leases. Calvert Corporation was operating a drilling rig. Through negotiations with Spear, of Calvert Corporation, written contracts were executed by Browne and Calvert Corporation, whereby wells were to be drilled on each lease. Calvert Corporation was to furnish labor, rig and tools. Browne obligated himself to pay, after completion or abandonment, $1.50 per foot on two of the wells and $2 per foot on the third well. The "going price" of drilling in the vicinity was $3 per foot. In the event of swabbing or bailing, Browne and Calvert "shall jointly stand expense"; also expense of treating with acid, shooting and cleaning out after shooting was to be paid in equal parts.

Browne was required to furnish one-half the cost of casing, cement, cementing operations, Schlumberger electrical logs and cores. The above was in addition to the $1.50 and $2 per foot costs.

Calvert Corporation conveyed a one-half interest in the Long and Bush leases to Browne and Browne conveyed a one-half interest in the Shafer lease to Calvert Corporation.

After the drilling was completed, Spear kept Browne advised of all developments. The first well produced oil for several weeks.

Browne agreed to suggestions of Spear. Browne admitted he was obligated to bear his cost of completing the well if it looked good. Efforts were made to complete all three wells, but the last two were dry. According to Spear, Browne was to give the Calvert Corporation half of any supplies or materials put into the well.

After the first well was drilled and the Schlumberger test was run, Browne agreed for Calvert Corporation to set casing. Browne testified that he was owner of the wells to the extent of fifty per cent. He admitted that "If we didn't want to set casing, certainly we should not." Spear called Browne to the Shafer well for Schlumberger test so that Browne could pass judgment on it. Browne objected to the price of casing being used at one time and furnished his own half. Upon abandonment of the Shafer well, the salvaged equipment was divided equally between Calvert Corporation and Browne. Spear testified that after production was obtained in the Shafer well, he, with the consent of Browne, operated same for both Browne and the Calvert Corporation. Appellant also testified in substance that the Calvert Corporation did operate the well during its production with his consent. All the materials and equipment for which recovery was allowed were used after drilling was completed.

Browne admitted he would have had one-half the profits if the wells had produced in paying quantities.

In Wagner Supply Co. v. Bateman, 118 Tex. 498, 18 S.W.2d 1052, 1055, the Su-

preme Court said: "There is present here not only a joint ownership of the lease * * * but joint operation, sharing of profits, community of interests, and the mutual agency of Roberts representing the partnership in the management of the lease and exploration for oil. * * * The rule is that a mining partnership arises by operation of law where co-owners work a mine. * * *" and "The plain facts are that the partnership was engaged in a mining enterprise, and Bateman became the purchaser of a one-fourth interest therein, paying for the same, however, in labor. As such he became a mining partner, subject to the liabilities and entitled to the rights and privileges of such relationship." See also Shell Petroleum Corp. v. Caudle, 5 Cir., 63 F. 296.

In Rucks v. Burch, 138 Tex. 79, 156 S.W.2d 975, 976, Judge Critz said: "It is settled as a law of this State that in order to constitute a mining partnership arising by operation of law there must not be only joint interest in the mining property but joint operation thereof as well. Joint ownership without joint operation merely constitutes cotenancy. To constitute a mining partnership it is essential that there be an actual working of the mine by the partnership."

It was held in Dunigan Tool & Supply Co. v. Carroll, Tex.Civ.App., 60 S.W.2d 296, writ refused, that mining partnership is defined as relationship arising from joint operation and sharing of profits.

Munsey v. Mills & Garitty, 115 Tex. 469, 283 S.W. 754, 759, adopted by Supreme Court, recognizes the following rules for mining partnership:

" 'A mining partnership arises by operation of law where co-owners work a mine. * * * It is not essential to the creation of a mining partnership that the partners shall expressly agree to become partners, or that there be an express agreement to share the profits and losses, as that is an incident in the prosecution of the general business. * * * In a mining partnership, the mine is owned by the partners as tenants in common. * * * Where joint owners of an oil lease unite in operating the premises without any special agreement as to their relation, they constitute a mining partnership. * * * Mining partnerships are applicable to oil and gas ventures.' "

A mining partnership may, of course, be created by express contract, and it may be created, without express contract, by joint operation of mineral interests. Templeton v. Wolverton, 142 Tex. 422, 179 S.W.2d 252. No express declaration or agreement of partnership is essential to the establishment of partnership rights where the intention of the parties may be gathered from the surrounding circumstances and their conduct with respect thereto. 58 C.J.S., Mines and Minerals, § 245, p. 687.

Viewing the evidence in the light most favorable to the trial court's judgment, and applying the above rules to same, we have reached the conclusion the appellees proved a mining partnership existed between Browne and the Calvert Corporation after the completion of the drilling.

Admittedly the leases were owned by Browne and Calvert Corporation, who were to share equally the losses and profits. Browne was to pay one-half the expenses after drilling was completed, the contract provided that if it is advisable to swab or bail "Browne and Calvert Corporation shall jointly stand expense of such operation." Browne's consultation about, and agreement to, certain decisions, and his disapproval of certain pipe and furnishing his own half, could properly be taken into consideration by the trial court in determining that Browne and Calvert Corporation "were co-owners working a mine." The sharing of the oil and the salvage also were factors to be considered by the court.

As said in Munsey v. Mills & Garitty, supra, " 'Where joint owners of an oil lease unite in operating the premises without any special agreement as to their relation, they constitute a mining partnership.' "

Both by the written contracts and the oral agreements between Browne and Calvert Corporation, it is shown that they were to complete and equip the wells at one-half

expense each, and they would be equal owners of the equipment. In fact they so recognized such ownership in dividing the salvaged material.

Under the rules announced in the above cases, Browne and Calvert Corporation were equipping and operating the wells together, and were therefore "co-owners working the mine."

After the drilling was completed, the work was carried on as a joint operation. The expenses incurred after the drilling were incurred by the mining partnership.

It is clear that their written contracts and the oral testimony as to method of operation were sufficient to support a finding of a joint working, as well as a joint ownership, partnership between them for the purpose of completing and operating the wells after the actual drilling was finished.

The point of error is overruled.

■ Appellant alleged error on the part of the court in not holding that the Calvert Corporation was an agent of the Sabine Machine & Supply Company. It is his position that no partnership relation existed between appellant and Calvert Corporation for the reason that Calvert Corporation and the Sabine Company, one of the appellees, were operated in such manner that the Calvert Corporation was an agent of the Sabine Company.

The trial was to the court without a jury. The evidence before him showed that the stock in the Sabine Company was owned one-half by Adamson and one-fourth each by Pinkston and Davis. The stock in the Calvert Corporation was owned one-fifth each by the above named three persons and one-fifth each by Spear and Rogers. Sabine Company had for several years been in the business of selling oil field supplies. The Calvert Corporation was chartered for the purpose of establishing and maintaining an oil business, with the authority to lease and purchase the right to prospect for, develop and use petroleum and gas and to build and own all necessary oil tanks, cars and pipe necessary for the operation of the business of the same.

The home office of the Sabine Company was at Kilgore. The home office of Calvert Corporation was at Tyler. The businesses of the two companies were kept on separate records and books at their respective places of business. The bookkeeper for Calvert Corporation had no connection with the Sabine Company. Directors' meetings, when held, were separate and apart for each corporation. The two corporations never represented themselves to the public as being one corporation or entity. They have different names and are engaged in different businesses. There is no proof that either the public or appellant was misled into believing they were the same or that one was the agent of the other. We will not cite further from the lengthy statement of facts. It is sufficient to say that we are of the opinion the evidence is sufficient to uphold the trial court's finding that the Calvert Corporation was not the agent of Sabine. State v. Swift & Co., Tex.Civ. App., 187 S.W.2d 127, and authorities cited.

We overrule the point of error.

The judgment of the trial court is affirmed.